**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JOSE MIGUEL GOMEZ DAVILA,**

    **Plaintiff,**

-vs-                                                                            **Case No.  6:12-cv-1885-Orl-DAB**

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

_____

# Memorandum Opinion & Order

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying his claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case. Oral argument has not been requested.

For the reasons that follow, the decision of the Commissioner is **AFFIRMED.**

## I.     BACKGROUND

### A.     Procedural History

Plaintiff filed new applications for a period of disability, DIB and SSI benefits on September 16, 2011, following the June 27, 2011 denial of his previously filed applications for DIB and SSI benefits. R. 19. He alleged an onset of disability beginning one date after the June 27, 2011 denial, due to HIV/AIDS, neuropathy and pain in the upper and lower extremities, low back pain, fatigue,

seizures, mental illness, and depression[1]. R. 110-12, 277-78, 289. His second application was denied initially and upon reconsideration. R. 150-73.

Plaintiff requested a hearing, which was held on May 16, 2012, before Administrative Law Judge Douglas Walker (hereinafter referred to as "ALJ"). R. 35-64. In a decision dated June 7, 2012, the ALJ found Plaintiff not disabled as defined under the Act through the date of his decision. R. 16-33. Plaintiff timely filed a Request for Review of the ALJ's decision which was denied on October 15, 2012. R. 1-6. Plaintiff filed this action for judicial review on December 18, 2012. Doc. 1.

### B.    Medical History and Findings Summary

At the time of the hearing, Plaintiff was forty-six years of age, and he had completed two years of college. R. 39, 253, 259. Plaintiff alleged an onset date of disability of June 28, 2011. R. 229. Prior to the alleged onset date, he was employed as a medical unit clerk, short order cook, cashier II, manager of a retail pet store, automobile salesperson, parts salesperson, kitchen helper, and linen room attendant. R. 39, 294. All of these jobs were classified as light and medium. R. 39.

Plaintiff's medical history is set forth in detail in the ALJ's decision. By way of summary, Plaintiff had been diagnosed with HIV in 1986 and had been in treatment; he complained of limitations from neuropathy and pain in his extremities and low back pain from in HIV/AIDS, mental limitations. R. 277-78, 289. After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from HIV, peripheral neuropathy, major depressive disorder and panic disorder, which were "severe" medically determinable impairments, but were not impairments severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. R. 21. The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform sedentary work, with a number of limitations. R. 23. Based upon Plaintiff's RFC, the ALJ determined that he could not perform past relevant work. R. 28. Considering Plaintiff's

---

[1] Plaintiff's date of last insured is December 31, 2015.

vocational profile and RFC, the ALJ applied the Medical-Vocational Guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, and, based on the testimony of the vocational expert ("VE"), the ALJ concluded that Plaintiff could perform work existing in significant numbers in the national economy as an addresser, document preparer, and surveillance security monitor. R. 29. Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision. R. 29.

Plaintiff now asserts three points of error. First, he argues that the ALJ erred by finding he had the RFC to perform sedentary work (with certain limitations) while failing to consider all of the evidence. Second, Plaintiff contends the ALJ erred by relying on the testimony of the VE after posing a hypothetical question that did not adequately reflect the limitations of the claimant. Third, he asserts that the ALJ erred in evaluating his credibility. For the reasons that follow, the decision of the Commissioner is **AFFIRMED.**

## II.     STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *Crawford v. Commissioner*, 363 F.3d 1155, 1158 (11th Cir. 2004), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Crawford*, 363 F.3d at 1158; *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995)(citations omitted).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of

the [Commissioner.]" *Id.* (quotations omitted); *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, he is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent his from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his residual functional capacity, age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled. 20 C.F.R. § 404.1520(f).

## III.     ISSUES AND ANALYSIS

### A.     RFC

Plaintiff argues that the ALJ erred in determining that he had the residual functional capacity to perform sedentary work (with certain non-exertional limitations) after failing to consider and weigh all of the pertinent evidence and failing to adequately consider his mental limitations. The Commissioner argues that the ALJ's opinion is very clear on which opinions the ALJ relied upon to formulate both Plaintiff's physical and mental RFC.

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.1545(a); *Lewis v. Callahan*,

125 F.3d 1436,1440 (11th Cir. 1997). The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof. *Id.* Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d), 416.927(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

> The ALJ made the following residual functional capacity determination:
>
> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) and as follows: the claimant can stand and walk two hours in an eight hour workday, sit six hours in an eight-hour workday, and lift 10 pounds. The claimant needs to avoid frequent ascending and descending stairs. Due to mild to moderate pain and medication side effects, the claimant should avoid hazards in the work place such as unprotected areas of moving machinery, heights, ramps, ladders, scaffolding, and on the ground, unprotected areas of holes and pits. The claimant could occasionally perform postural limitations in balancing, stooping, crouching and crawling, but not climbing. The claimant has moderate non-exertional mental limitations which affects his ability to concentrate upon complex or detailed tasks, but would remain capable of understanding, remembering and carrying out simple job instructions; making work related judgments and decisions; responding appropriately to supervision, co-workers and work situations; and dealing with changes in a routine work setting.

R. 23. Based on the residual functional capacity he assigned to the claimant, the ALJ concluded that Plaintiff was not capable of performing his past relevant work, but, based on VE testimony, concluded Plaintiff could perform other jobs and was, therefore, not disabled. R. 28-29.

Plaintiff contends that the ALJ and the Appeals Council ("AC") failed to adequately consider and give appropriate weight the opinion of Plaintiff's treating neurologist, Dr. Aragon, whose functional limitations would support a RFC of less than sedentary work, and the opinion of the psychological consultative examiner, Dr. Segota (R. 445), in violation of the holding of *Winschel v. Commissioner of Social Security*, 631 F.3d 1176, 1179 (11th Cir. 2011) (holding that whenever a physician offers a statement reflecting judgments about the nature and severity of a claimant's impairments, including symptoms, diagnosis, and prognosis, what the claimant can still do despite his or her impairments, and the claimant's physical and mental restrictions, the statement is an opinion requiring the ALJ to state with particularity the weight given to it and the reasons therefore).

Plaintiff was diagnosed with HIV in the mid-1980's. R. 440. An EMG study was performed in January 2010 based on Plaintiff's claims of intermittent pain and constant numbness in legs and upper extremities, which revealed bilateral peroneal motor neuropathy. R. 485. However, the neurologist, Dr. Aragon, noted that "[c]linically this patient suffers from meralgia paresthetica, greater on the left than on the right, which likely points to an incipient generalized peripheral neuropathy." R. 485-86. In May 2010, Plaintiff's treating HIV specialist, Dr. Lou of the Orange County Health Department Clinic, assessed Plaintiff with "AIDS, severe, progressive" on Plaintiff's reports that nothing helped his pain and he could not function, nor could he obtain methadone because the AIDS Foundation named after Ryan White would not pay for it. R. 441. Plaintiff continued to complain to Dr. Lou of paresthesia/numbing pain "all over his body" (R. 409), throughout spring and summer of 2010. R. 405, 409, 410, 411.

In September 2010, Plaintiff returned to Dr. Aragon, who reviewed the EMG study, and noted a decreased vibratory perception at the ankles, as well as hypoesthesia in the anterolateral aspect of the thighs and upper extremities. R. 486. However, the EMG of the upper extremities in September 2010 reported normal results from a "difficult and incomplete study because of extremely poor

tolerance of the test by the patient; left median motor and sensory and ulnar sensory conduction were normal." R. 487. Dr. Aragon concluded that most of the claimant's "pain is related to meralgia paresthetica." R. 486. The Mayo Clinic website defines this condition as:

> Meralgia paresthetica is a condition characterized by tingling, numbness and burning pain in [the] outer thigh. The cause of meralgia paresthetica is compression of the nerve that supplies sensation to the skin surface of [the] thigh. Tight clothing, obesity or weight gain, and pregnancy are common causes of meralgia paresthetica. However, meralgia paresthetica can also be due to local trauma or a disease, such as diabetes. In most cases, meralgia paresthetica can be relieved with conservative measures, such as wearing looser clothing. In severe cases, treatment may include medications to relieve discomfort or, rarely, surgery.

http://www.mayoclinic.org/diseases-conditions/meralgia-paresthetica/basics/definition/con-20030852. Although Dr. Aragon had not seen Plaintiff in nine months, in June 2011, he completed an "HIV Medical Assessment (non-SSA) Form," opining that Plaintiff could only sit for thirty minutes at a time; stand for ten minutes at a time; sit for less than two hours total in an eight-hour workday; stand for less than two hours total in an eight-hour workday; and could lift ten pounds. R. 482-83.

After his visit in September 2010 to see Dr. Aragon, Plaintiff returned to his treating HIV specialist, Dr. Lou, in October 2010 reporting that he was taking Lyrica and Neurontin, and his pain was a little better. R. 403. By November 2010, he complained that the pain came back again and the medications were not working. R. 401. On December 3, 2010, Plaintiff returned complaining that none of the medications were working for pain and they made him very jittery and paranoid; he looked agitated, depressed, and in pain; Dr. Lou opined that his neuropathy was "resistant." R. 399. At the January 18, 2011 visit, Dr. Lou noted, "Patient said medication made him sick. [Patient] came to clinic, said pain disappeared and Cymbalta + 2 Percocet made pain [go] away. He had court hearing end of last month[2] with positive result. [Patient] is walking normal. Mood is great, happy."

---

[2] In the fall of 2010, Plaintiff had consultative examinations for his physical and mental conditions as part of his previous disability application. R. 73.

R. 395. Dr. Lou's notes from February 10, 2011 report "[Patient] says pain came back ???? but everything else is fine." R. 391.

Plaintiff's hearing for his first disability application was held on June 7, 2011 before ALJ Mahon. R. 68[3]. On June 9, 2011, Plaintiff returned to see Dr. Lou, who discussed with him the development and progress of his peripheral neuropathy. R. 358. Plaintiff told Dr. Lou that he started all medications, but they were not working; therefore, Dr. Lou advised him that he better stop Lyrica and possibly the other medications for pain except HIV medications. R. 358. Dr. Lou noted "Patient was very upset because I did not fill out disability form which it is beyond my qualification. He left clinic unhappily." R. 358. Dr. Lou filled out additional pages of Progress Notes stating:

> Today [patient] came to clinic as a walk in to fill out his papers. Then our nurse supervisor kindly asked me if I could fill out his paper in [the] middle of clinic although she knew I cannot fill out a disability evaluation. This is clinic policy that do not do disability evaluation due to complexity of exam but she wanted patient to hear [it] from me. I explained to Mr. Jose Gomez that his attorney needs a medical expert to fill out disability evaluation. I have to mention in the record the history of Mr. Jose Gomez because more complex. On 1/18/11, Mr. Gomez walked in clinic walking normal in a very good mood that all pain went away, and he does not need medication for pain anymore. He said had court hearing with positive result. I was very happy he is pain free after many months but he came back next visit again with pain. He mentioned that his case was not finished with disability yet. I became more confused about the [patient] on one visit after social security he was very happy with NO pain. He seems frustrated but hard to match his symptoms with objective finding. [Patient] says is taking medication. Patient symptoms do not match with objective [finding].

R. 359-60. Plaintiff returned in July 2011, complaining of pain in his legs; however, Dr. Lou noted that "everything is subjective," apparently not convinced of the sincerity of Plaintiff's neurological complaints; however, he referred Plaintiff to pain management. R. 356-57. In August, he was seen at the clinic, and Dr. Lou assessed Plaintiff as HIV+ (non-AIDS) asymptomatic. R. 357.

In September 2011, Dr. Lou took the extraordinary step of writing up several additional records to expand on the records of his previous treatment of Plaintiff from January 2011 – the

---

[3]ALJ Mahon's decision was issued on June 27, 2011. R. 76.

-8-

appointment when Dr. Lou noted Plaintiff had come in the clinic walking "normally" and "in a very good mood that all pain went away." *See* R. 359. Dr. Lou wrote in the Progress Note dated September 8, 2011 "for visit 1/18/11" the following:

> This visit is duplicated for visit dated 1/18/11. [Patient] in that day walked in with normal walking [and] very happy. He said all of those symptoms that he had were due to all medication that I gave to him and since he stopped everything back to normal. When I asked him what happened to his disability case, he replied his case was approved. Pt. looks happy, smiling. Peripheral neuropathy ?? Resolved. No medication is needed. [Patient] stopped. Continue only HIV medications.

R. 393-94.

In October 2011, Plaintiff reported to Dr. Gerber, the pain management physician, that he had been experiencing neuropathy-type symptoms in his arms and legs for a few years. R. 373. Plaintiff's subjective pain diagram indicated "parethesias, numbness and tingling throughout his arms and proximal legs." R. 373. Notes from the Clinic indicated to Dr. Gerber that an electrodiagnostic study from six months before led to Plaintiff being diagnosed with peripheral neuropathy. R. 373. He reported that he had tried Lyrica, Cymbalta, and Neurontin, "though according to the patient he may have had all of these concurrently, and he states he had some side effects from these. He states when he stopped them he felt a little better." R. 373. He was also on Seroquel and HIV medications." R. 373. Dr. Gerber opined Plaintiff had "what may be HIV-related neuropathy." R. 373. Plaintiff "reported moderate symptoms, which appeared to be more related to numbness and neuropathy as opposed to pain. He really does not have severe pain. It is mostly some weakness and numbness." R. 373. Plaintiff had mild weakness in the lower extremities and it "just appears his gait is a little off." R. 374. Dr. Gerber opined that Plaintiff exhibited symptoms consistent with motor and sensory neuropathy, but he wanted to review the electrodiagnostics, so his office would try to get those. R. 374. Dr. Gerber opined that Plaintiff should be treated by a neurologist, with a neuropathic medication (rather than a pain management specialist); he noted "there is really not a specific pain state at this

time, though the neuropathy symptoms may benefit from a neuropathic agent. Based on the patient's reported history of having a few agent together, I would like to retry one at a time and see how he does." R. 374. "I do not feel he needs opioids or other interventional pain procedures for this condition. No signs and symptoms of radiculopathy or acute low back pain are noted." R. 375. Dr. Gerber prescribed Neurotin and requested that Plaintiff be referred to a neurologist through Orange County Medical Clinic and Dr. Lou. R. 375. It is not clear why Dr. Gerber was unaware that Dr. Aragon was treating Plaintiff as his neurologist, especially since Dr. Aragon, not Dr. Gerber, filled out the "Medical Assessment Form" in June 2011.

A copy of Dr. Gerber's report was sent to Dr. Lou and is contained in those records, with an addendum from Dr. Lou, who wrote on November 4, 2011:

> The history that patient gave to Dr. Gerber regarding neuropathic agent was not correct. All anti neuropathic agents were tried individually and added one by one due to lack of response and patient came back from disability meeting one day and he was happy and had no problem. Said all his problems went away and blaming medications caused his condition. But 1-2 weeks later came back after his disability was denied stating all his problems came back.

R. 375. At the appointment on November 29, 2011 with Dr. Lou, he noted: "[Patient] misreported to pain management about treatment for peripheral neuropathy. According to pain clinic report he falsely told pain clinic that I gave him all medications at once and that made him sick"; he noted Plaintiff was a "poor historian." R. 381. Dr. Lou's assessment of Plaintiff's condition was "HIV+ (non-AIDS) asymptomatic with peripheral neuropathy, and lipodystrophy. R. 381. "[Patient] said he coped with pain on his legs/feet but he is concerned about his belly that [is] getting bigger. [Patient] admitted he missed his medications possibly 1-2 weeks. [Patient] abdomen is larger but no organomegalia - exam limited due to obesity." R. 380. Dr. Lou explained lipodystrophy to Plaintiff in detail, including treatment with a drug called Engrifta, which does not cure it but can control it; however, the Ryan White program (which subsidized Plaintiff's other HIV drugs) did not pay for the

drug. R. 381. Dr. Lou offered Plaintiff an abdominal sonogram if Plaintiff was "too much concern[ed] about his abdomen. He refused. He said he believes his neuropathy [was] because of Lyrica and looking to sue Roch [sic]." R. 381.

In November 2011, Plaintiff returned to Dr. Gerber–not Dr. Aragon–with complaints of peripheral neuropathy in his upper and lower extremities. R. 452. During the physical examination, Dr. Gerber noted a reduced range of motion in the thoracic spine; absent reflexes at the knees and ankles; decreased sensation in the lower extremities; and mild weakness diffusely throughout the lower extremities, consistent with motor and sensory neuropathy. R. 452. Dr. Gerber noted Plaintiff's chief complaint was peripheral neuropathy but he was only taking HIV medications, although he takes Neuronotin at bedtime. R. 452. He opined that neuropathic pain was best treated with non-opiate medications like Neurontin. R. 452.

On November 14, 2011, Dr. Perdomo performed a consultative physical examination. R. 440-42. Plaintiff reported side effects from the medications prescribed for his HIV caused persistent nausea, abdominal pain and chronic diarrhea, generalized weakness, fatigue, back pain, and peripheral neuropathy. R. 440. During the physical examination, Dr. Perdomo noted that there was a decreased range of motion in the cervical and thoracolumbar spine. R. 441. The neurological examination revealed decreased sensation to pinprick in both upper and lower extremities. R. 441. Based on the examination, Dr. Perdomo indicated that Plaintiff had chronic neck pain with mild musculoskeletal functional limitations on physical exam; chronic low back pain with severe musculoskeletal functional limitation on physical exam; peripheral neuropathy; HIV positive; history of bipolar disorder, insomnia, and paranoid schizophrenia; and obesity. R. 441. Dr. Perdomo then concluded that Plaintiff could stand and walk for 3 to 4 hours a day in an 8 hour workday; sit for 4 hours in an 8 hour workday; lift up to 10 pounds; and should avoid repetitive bending, stooping and crouching. R. 441.

As the Commissioner points out, the ALJ specifically relied on the opinions of the state agency non-reviewing physician and the consultative examiner, Dr. Perdomo, as well as the clinical findings of Dr. Lou that in May 2011, Plaintiff reported being "very happy" and pain free:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> The claimant is a pleasant individual. At the hearing, he was well represented by an experienced representative. The claimant does have some difficulties and the undersigned is not unsympathetic with those difficulties. Nonetheless, this fine individual has significant potential.
>
> A state physician had the opportunity to evaluate the medical evidence and opined that the claimant could stand and walk four hours in an eight-hour workday, sit 6 hours in an eight-hour workday and lift 10 pounds frequently and occasionally. The claimant would have occasional postural limitations in climbing, balancing, stooping, kneeling, crouching and crawling. Dr. Perdomo also opined that the claimant could stand and walk 3-4 hours in an eight-hour workday, but could only sit 4 hours in an eight-hour workday. The medical evidence shows that in January 2011 that he walked normal, felt good and was in no pain. In May 2011, he was very happy and in no pain. The claimant did not allege any pain until July 2011 when he was told that his disability paperwork would not be completed as he had positive findings. His pain was felt to be subjective. In October 2011, the claimant had numbness and neuropathy as opposed to pain. Progress notes in April 2012 showed he looked better and had normal speech flow. The undersigned finds that based upon the overall objective findings that there is no indication that the claimant cannot sit six hours in an eight-hour workday. Giving the claimant the benefit of doubt, the undersigned does limit him to standing and walking two hours in an eight-hour workday and lifting 10 pounds. Dr. Lou indicated in an HIV questionnaire that the claimant had neuropathy involving two or more extremities. The claimant does have neuropathy and slight lower extremity weakness resulting in an antalgic gait. However, he has no limitations with his upper extremities as found in Dr. Perdomo's evaluation of normal grip and fine manipulation.
>
> Accordingly, the undersigned finds that the claimant could perform the wide range of sedentary exertion. The undersigned further limits the claimant to avoid frequent ascending and descending stairs. Due to mild to moderate pain and medication side effects, the claimant should avoid hazards in the work place such as unprotected areas of moving machinery.

R. 26-27.

Plaintiff argues that the ALJ and the AC erred by failing to state the weight given to the opinions of the treating neurologist, Dr. Aragon, and that of the psychological consultative examiner, Dr. Segota. The ALJ did not discuss the treatment records of Dr. Aragon because Plaintiff last saw Dr. Aragon in 2010 and did not return to seek treatment from him again after September 2010, instead seeking treatment from the pain management doctor, Dr. Gerber, despite Dr. Gerber's advice to get a referral from Dr. Lou (at Orange County Health Department) to see a neurologist. Dr. Lou would not refer Plaintiff to a neurologist because he was skeptical of the severity of Plaintiff's claims, calling them "subjective" and challenging Plaintiff's history of treatment and the effectiveness of the antineuropathic medication. Because Plaintiff had been found not disabled through June 27, 2011 (R. 19), and Plaintiff did not appeal that decision, the decision became final; thus, the ALJ did not review the 2010 evidence from Dr. Aragon. Nine months after he had last seen Plaintiff, Dr. Aragon completed an "HIV Medical Assessment Form," essentially opining that Plaintiff's exertional limitations kept him from performing even sedentary work. R. 482-83. The Form was dated June 9, 2011, roughly two weeks prior to the first ALJ's decision finding Plaintiff not disabled as of June 27, 2011; in that earlier decision, ALJ Mahon cited the medical evidence from Dr. Aragon, but gave his opinion from June 9, 2011 "little weight" as inconsistent with his own treatment records. R. 73-74. ALJ Walker made a point at the second hearing of saying that he did not intend to revisit the medical evidence from the prior decision (pre-June 27, 2011 time period) which was res judicata, as exemplified by the choice of the June 28, 2011 onset date. R. 40. It was not error for ALJ Walker or the AC to omit discussion of Dr. Aragon's June 7, 2011 opinion and 2010 records.

Moreover, ALJ Walker discussed the other pertinent medical records from the post-June 27, 2011 period at some length. Although Dr. Lou opined on January 12, 2012 in a generic one-page form that Plaintiff had "a diagnosis of AIDS and peripheral neuropathy" (R. 489), the physician repeatedly assessed Plaintiff as "HIV+ (non-AIDS) asymptomatic throughout 2011 in the period immediately

-13-

before he wrote the letter. *See, e.g.,* R. 357, 381. Dr. Lou's opinion on the HIV Medical Assessment Form dated April 25, 2012– which the ALJ discussed (R. 26)–indicated "none" in all categories of HIV opportunistic and indicator diseases, except "other neurological manifestations of HIV infection (e.g., peripheral neuropathy)" (R. 473-75) despite Dr. Lou's pointed documentation Plaintiff's inconsistent and "subjective" complaints of neurological pain (as the Court discussed above). Dr. Lou refused to give an opinion on Plaintiff's physical limitations, stating he was "unable to assess" them because Plaintiff "needs to be examined by a qualified . . . doctor with rehabilitation/orthopedist expertise" since he is an HIV specialist. R. 476-78. In other words, Dr. Lou did not express an opinion as to Plaintiff's exertional limitations. The ALJ's decision to credit Dr. Perdomo's opinion rather than Dr. Lou's equivocal opinion was based on substantial evidence.

Plaintiff also argues that the ALJ and the AC erred in failing to state the weight given to the psychological consultative examiner, Dr. Segota's opinion (R. 445). On November 15, 2011, Dr. Segota performed a psychological evaluation of Plaintiff, noting that he reported suffering from depression and anxiety, problems with paranoia, decreased energy, decreased appetite, anhedonia, decreased concentration, forgetfulness, rumination, hopelessness, and helplessness. R. 443-47. During the mental status evaluation, Dr. Segota found the claimant's mood to be "down" and his affect "fatigued," concentration was impaired, and he exhibited impaired performance on abstract verbal reasoning, and his judgment was impaired for independent functioning. R. 445. Dr. Segota indicated that the testing supported the diagnoses of Major Depressive Disorder and Panic Disorder with a global assessment of functioning score of 45. R. 446. The ALJ considered the opinions of both Dr. Segota and the non-examining physician:

> A state agency psychologist also had the opportunity to evaluate the clinical findings and other reports and opined that the claimant had mild restrictions of activities of daily living, moderate limitations with social functioning, moderate deficiencies in concentration, persistence and pace and no evidence of episodes of decompensation. Specifically, the claimant could understand and remember simple instructions and

> carry out routine regular tasks. The claimant would have moderate limitations with responding appropriately to supervision, co-workers and work situations; and dealing with changes in a routine work setting.
>
> The claimant was not under any mental health treatment since his alleged onset date of disability [June 28, 2011]. Prior treatment did show he was doing well on medications and improving. The claimant was started on medications and the following visit there was improvement in his mental status. The consultative evaluation with Dr. Segato [sic] showed that his immediate and long-term memory was intact. The claimant's concentration was impaired, however, he was able to add, subtract, multiply and divide. Dr. Segato [sic] found that the claimant would need help with his finances. The claimant reported that his mother has to remind him to take a shower; however, he had no problems remembering to take his medications. The claimant reported that he could speak and communicate with others. The claimant can count change.

R. 27. The ALJ adopted the mental restrictions of the state agency psychologist's opinion, determining, as to the severity of Plaintiff's mental impairment, that he had mild restrictions in daily living, and moderate difficulties in social functioning, and concentration, persistence and pace. R. 22. Overall, the ALJ found Plaintiff had moderate mental limitations which affected his ability to concentrate upon complex or detailed tasks but would remain capable of understanding, remembering and carrying out simple job instructions; making work related judgments and decisions; responding appropriately to supervision, co-workers and work situations; and dealing with changes in a routine work setting. R. 28. The ALJ's opinion was consistent with Dr. Segota's conclusion that Plaintiff's concentration was impaired but he was still able to do simple math. In keeping with Dr. Segota's opinion that Plaintiff's judgment was impaired for independent functioning, the ALJ also found that Plaintiff would have moderate limitations with responding appropriately to supervision, co-workers and work situations; and dealing with changes in a routine work setting. Accordingly, the ALJ's (and the AC's) decision was based on substantial evidence.

### B.     Pain and credibility.

Plaintiff asserts that the ALJ erred in evaluating his neurological pain due to peripheral neuropathy and in assessing his credibility.

-15-

Pain is a non-exertional impairment. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote*, 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

Although the ALJ did not refer to the Eleventh Circuit's pain standard as such, he clearly was aware of the governing standards for evaluating subjective complaints because he cited the applicable regulations and Social Security Ruling ("SSR") 96-7p. R. 23. *See Wilson v. Barnhart*, 284 F.3d 1219, 1225-26 (11th Cir. 2002)(per curiam)(ALJ properly applied the Eleventh Circuit pain standard even though he did not "cite or refer to the language of the three-part test" as "his findings and discussion indicate that the standard was applied"). The ALJ complied with these standards by determining that Plaintiff had an objective medical condition that could give rise to the alleged symptoms, because otherwise the ALJ would not be required to assess the credibility of the alleged complaints.

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.

*Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

As discussed at some length above, the ALJ offered specific reasons for discrediting Plaintiff's subjective complaints, based on Dr. Lou's progress notes, showing:

> The medical evidence shows that in January 2011 that [Plaintiff] walked normal, felt good and was in no pain. In May 2011, he was very happy and in no pain. The claimant did not allege any pain until July 2011 when he was told that his disability paperwork would not be completed as he had positive findings. His pain was felt to be subjective. In October 2011, the claimant had numbness and neuropathy as opposed to pain. Progress notes in April 2012 showed he looked better and had normal speech flow. The undersigned finds that based upon the overall objective findings that there is no indication that the claimant cannot sit six hours in an eight-hour workday.

R. 27. After the incident casting Plaintiff's neurological pain in doubt, Dr. Lou also refused to give an opinion on Plaintiff's exertional limitations. The ALJ was entitled to reject Plaintiff's subjective statements of his limitations for numbness and pain, and rely on Dr. Perdomo and the state agency physician's opinions about Plaintiff's functional capacity. The ALJ's reasons are supported by substantial evidence.

### C. Hypothetical

Plaintiff contends that, because the ALJ's RFC determination was incorrect, the ALJ's hypothetical to the VE based on the RFC was also defective, thus, the ALJ's decision based on the VE's testimony was not based on substantial evidence.

The Plaintiff is correct that case law in this circuit requires that the ALJ must employ hypothetical questions which are accurate and supportable on the record and which include all limitations or restrictions of the particular claimant. *Pendley v. Heckler*, 767 F.2d 1561 (11th Cir. 1985). Where the hypothetical employed with the vocational expert does not fully assume all of a

claimant's limitations, the decision of the ALJ, based significantly on the expert testimony, is unsupported by substantial evidence. *Id.* at 1561 (quoting *Brenam v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980)).

Given the Court's rulings that the ALJ's RFC determination and credibility findings were based on substantial evidence, the ALJ's hypothetical to the VE was properly based on substantial evidence in the record, and the ALJ was entitled to rely on the VE's testimony.

## IV.   CONCLUSION

The record in this case shows that Plaintiff does not enjoy full health and that his lifestyle and activities are affected by his HIV and some numbness. The ALJ appropriately considered these circumstances and analyzed them in relation to the exacting disability standard under the Social Security Act. For the reasons set forth above, the ALJ's decision is consistent with the requirements of law and is supported by substantial evidence. Accordingly, the Court **AFFIRMS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on August 6, 2014.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record